

ROLEAN RAVENELL

Plaintiff,

-against-

Maimonides Medical Center

Defendant

CV 23-2320

GUJARATI, J.

SCANLON, M.J.

-----------------------------------------------------------------x

The complaint of the plaintiff, Rolean Ravenell respectfully shows and alleges as follows:

1. The plaintiff herein, is a resident of the State of New York. Ms. Ravenell resides at 579 Schroeders Avenue, Brooklyn, NY 11239.

2. The Plaintiff worked for Maimonides Medical Center for nearly 17 years before being fired in November, 2021.

3. Between 2020 and 2021 as Maimonides implemented the process to respond to the Department of Health's process to implement the Covid-19 mandates. This resulted in significant emotional distress and financial loss to the Plaintiff the thoughts and emotions around the vaccines which were rushed to the market race against death began with exultation at the thought that something was coming on the market

4. This process would seek to have the population of many parts to the world become vaccinated with the COVID-19 vaccine. It soon became apparent that while there were many compelling reasons why a person would want to take the COVID vaccine, there were equally important reasons why some people would not want to take the COVID-19 vaccines. In fact, after an intense period of prayer and self-examination, the Plaintiff made the decision *not to* take the

COVID-19 vaccines for reasons related to her pre existing health issues with Bells Palsy and her faith.

1  5. In fact the environment at Maimonides was openly not supportive of the religious exemption. Ms. Ravenell approached the 1199 Union Delegate for the Cancer Center asking if there was any assistance she could receive as she had faithfully attended union meetings. She was told *no one* was supporting the religious exemption.

In its position paper of June 6, 2022, Maimonides states that it is a healthcare institution that must comply with all rules and regulations issued by the New York State Department of Health (DOH including the COVID-19 mandate implemented in August 2021.

Maimonides goes on to state that the *Maimonides' requirement that Ms. Ravenell, who was employed as a Radiation Therapist, a patient-facing position in the Maimonides Cancer Center, receive the COVID-19 vaccine was simply complying with the Department of Health. "Maimonides has no ability to disobey the requirements of the DOH. If it did, Maimonides would risk severe penalties, including the revocation of its license."*

*Maimonides goes on to state "Ultimately, Ms. Ravenell is asking the Commission to require Maimonides to risk significant penalties from the DOH by granting her a medical exemption to the COVID-19 vaccine mandate when DOH itself has stated there is no religious exemption to the COVID-19 mandate for patient facing employees. This remedy would simply be unjust and put Maimonides in an impossible position."*

Note: Ms. Ravenell's impression was that Maimonides was not saying that Ms. Ravenell does not qualify for a Medical exemption but that DOH would not be pleased and it would cause a problem for Maimonides.

6. Also in this section of the Maimonides Regulation, significantly, removes any reference to a religious exemption as a means not to abide by the vaccine mandate as such the DOH clearly shows that a religious exemption was not available to Maimonides personnel

7. Maimonides followed the mandates of the DOH, but in doing so they:

-down-played and overlooked the actual importance of the Civil Rights law being - violated-- Title VII of the 1964 Civil Rights Law.

-overlooked the devastation to families and individuals caused by the impact of individuals losing their jobs because they did not have a religious or medical exemptions.

- discriminated against individuals who were not vaccinated by fully promoting the untruth that people who took the vaccine would not spread or contract COVID-19.

-Promoted untruths such as Bells Palsy not being contraindicated for COVID19 vaccine and causing people to take the vaccine in spite of published studies indicating possible harm by taking the COVID -19 vaccine.

-Failed to offer any accommodation for the religious exemption though the hospital is an employer and has many positions at different levels.

. Maimonides never reached out to see if there was any assistance that could be offered, the Plaintiff was fired.

, The Plaintiff was terrified of how she would be able to meet monthly financial responsibilities—put food on the table, pay bills, tuition for children, and monthly mortgage.  Ms. Ravenell survived during this time off of the charity of friends and family.

8. Here is a portion of letter sent to Paul Stuart informing him of facts around COVID, Ms. Ravenell is essentially begging for her job:

*Dear Mr. Stuart,*

*This letter is being sent to you in response to your most recent e- mail.  I have been an employee of the Maimonides Medical Center for over 16 years. During the time of my employment at Maimonides, I have been an exemplary employee—I have over 420 hours of sick time (the maximum that an employee can carry. I rarely took off. I worked each day of the Covid 19 pandemic, attending to patients, even coming to work in times of snowstorms and picking up other employees to make sure that there would be coverage. I felt proud of my actions as New York State celebrated its front-line workers. I have been a loyal employee who worked diligently.*

*Up until I was ordered to leave my position—without pay, unemployment or any income due to not being vaccinated, I never contracted the Covid19 virus, however we did treat a Covid19 patient who was fully vaccinated in the cancer center.*

*Title VII of the Civil Rights Act of 1964 prohibits discrimination in the workplace based on skin color, ethnicity, gender, medical condition, or religion. I believe that my rights are being discriminated against as I am in a comparison of vaccinated vs. unvaccinated individuals.  I am exempt from taking a vaccine because it conflicts with my sincerely held religious beliefs which I outlined in my request for a religious exemption.  The purpose of this email is to discuss your stated reason for not accommodating my request for a religious exemption.*

*According to your email dated 10/14/21* **"those employees who are granted a religious exemption, the medical center must determine if the exemption can be accommodated without causing undue hardship for the medical center."** *Your communication goes on to state* **'The Medical Center's Clinical leadership determined that <u>unvaccinated</u> employees pose a safety risk to patients, co-workers, visitors and others and therefore, cannot be accommodated."**

*The logic of this statement is against the science, and shows clear discrimination against the unvaccinated:*

1. *CDCs current data indicates that that both vaccinated and unvaccinated individuals both can contract and transmit the COVID 19 virus.[1]*

*On July 27th, CDC updated its guidance for fully vaccinated people, recommending that everyone wear a mask in indoor public settings in areas of substantial and high transmission, regardless of vaccination status. This decision was made with the data and science available to CDC at the time, including a valuable public health partnership resulting in rapid receipt and review of unpublished data. Recently, "data were published in CDC's Morbidity and Mortality Weekly Report (MMWR), demonstrating that Delta infection resulted in 1similarly high SARS-CoV-2 viral loads in vaccinated and unvaccinated people High viral loads suggest an increased risk of transmission and raised concern that, unlike with other variants, vaccinated people infected with Delta can transmit the virus. Fully vaccinated people who get COVIID can spread the virus to others even if they are not symptomatic.*

*The new data, published in the U.S. agency's Morbidity and Mortality Weekly Report, also found that fully vaccinated people who get infected carry as much of the virus in their nose as unvaccinated people, and could spread it to other individuals.*

*Maimonides reflected the positive sentiments of DOH and the Governor of New York towards the vaccine mandate. This is indicated by Maimonides naming and outlining The States and institutions that had banned religious exemptions.*

8. In the position paper, Maimonides named and outlined all the states across the country but, Maimonides did not have to do this. They could have stopped after stating that DOH forced them to fire staff that did not take the vaccine and did not have an exemption, but instead they touted the institutions and states that banned religious exemptions.

9. Title VII of the Act of 1964 makes it unlawful for an employer to discriminate against someone because of

    -Race

---

[1] https://www.cdc.gov/media/releases/2021/s0730-mmwr-covid-19.html

-Color

Religion

Sex

10. In August, 2021 then the New York State Department of Health vaccine mandate came under fire when the

New York State Department of Health (NYSDOH) implemented *an emergency regulation – 10 N.Y.C.R.R. § 2.61 (the Regulation) – requiring covered healthcare entities to ensure that their "personnel" are "fully vaccinated" against COVID-19. The NYSDOH Commissioner *permanently* adopted the regulation in June 2022. Commonly referred to as a COVID-19 vaccine mandate for healthcare workers, the Regulation has been the subject of several legal challenges in both state and federal courts.

11. On Jan. 13, 2023, Onondaga County Supreme Court Justice, Hon. Gerard J. Neri, struck down the Regulation on the premise that the Commissioner of Health, Gov. Hochul and the NYSDOH (collectively, Respondents) acted beyond the scope of their authority in enacting the Regulation.[1] Judge Neri agreed with Medical Professionals for Informed Consent, an informed consent advocacy group, and two named physicians (collectively, Petitioners-Plaintiffs), that the Regulation was *ultra vires* and, therefore, unenforceable.

12. Petitioners-Plaintiffs challenged the vaccine mandate, seeking a declaration that the Regulation was promulgated in violation of the New York State Constitution and that the Legislature did not authorize the NYSDOH to enact it. Petitioners-Plaintiffs also brought an Article 78 proceeding, challenging the Regulation on the basis that the Commissioner and NYSDOH acted "in excess of their jurisdiction" and on the basis that the Regulation **is "preempted by the New York State Human Rights Law, which requires reasonable religious accommodation absent a finding by the**

employer that the individual in question cannot be safely accommodated without posing a direct threat."[2]

13. In granting Petitioners-Plaintiffs' request for declaratory relief, Judge Neri found that without express legislative authority, the Commissioner of Health is prohibited from mandating vaccinations, such as the COVID-19 vaccine. Although the Legislature has authorized certain immunization programs, such as for measles, mumps and rubella for children, the public health law is silent as to COVID-19 or coronaviruses in general. Because mandatory immunization programs may only be implemented pursuant to specific provisions of the public health law, and because the public health law is

silent when it comes to COVID-19 or coronaviruses in general. Because mandatory immunization programs may only be implemented pursuant August 2021, the New York State Department of Health (NYSDOH) implemen00544459*ted an emergency regulation – 10 N.Y.C.R.R. § 2.61 (the Regulation) – requiring covered healthcare entities to ensure that their "personnel" are "fully vaccinated" against COVID-19. The NYSDOH Commissioner permanently adopted the regulation in June 2022. Commonly referred to as a COVID-19 vaccine mandate for healthcare workers, the Regulation has been the subject of several legal challenges in both state and federal courts.

13.1 **Update:**  The Appellate Division of the Supreme Court of New York in the Fourth Judicial Department issued a stay on Judge Neri's order on February 27, 2023.  The stay will keep New York's COVID-19 vaccine mandate for health workers in place while the appeal of the decision is ongoing, halting enforcement of the Judge's January 13, 2023, decision.  The appeal will be added to the court's term commencing May 15, 2023.

On January 13, 2023, New York State Supreme Court Judge Honorable Gerard J. Neri invalidated the New York State COVID-19 Vaccine Mandate continuously requiring health care workers to be "fully vaccinated against COVID-19," unless a specific exception applies.  Hon. Judge Neri ruled in favor of the Petitioners – Medical Professionals for Informed Consent, a group of medical professionals – declaring that the COVID-19 Vaccine Mandate requirement exceeded the authority of Governor Kathy Hochul and the New York State Department of Health.

During the beginning stages of the COVID-19 Pandemic, the New York Legislature ceded powers to then Governor Andrew Cuomo on an emergency basis. On June 24, 2021, Governor Cuomo rescinded his previous emergency orders related to the COVID-19 Pandemic, effectively ending the emergency resulting from the pandemic. Subsequently, on June 22, 2022, the Commissioner of the New York State Department of Health adopted the vaccine mandate as a permanent regulation.

Hon. Judge Neri found that the COVID-19 Vaccine Mandate is preempted by New York State Law. Specifically, Public Health Law Sections 206 and 613 prohibit "mandatory immunization of adults or children." NY Pub Health Law §§ 206, 613. While the legislature intended to grant the New York State Department of Health authority to oversee "voluntary adult immunization programs," the Judge held that the vaccine mandate exceeded the parameters of power granted by the legislature, citing *Matter of NYC C.L.A.S.H., Inc. v. N.Y. State Off. of Parks, Recreation & Historic Preserv.*; 27 N.Y.3d 174, 178 [2016] (citing *Greater NY Taxi Assn. v. NY City Taxi & Limousine Commn.*, 25 N.Y.3d 600, 608 [2015]).

On January 24, 2023, the New York State Department of Health appealed Judge Neri's decision to the Appellate Division of the Supreme Court for the Fourth Judicial Department. The Department of Health considers the vaccine mandate essential, referring to the COVID-19 Vaccine Mandate as a "critical public health tool" in their statement to the Associated Press on January 14, 2023. The appeal challenges "each and every party" of Judge Neri's decision, and the case is currently ongoing.

> Ms. Ravenell applied for both a Medical and a Religious exemption. Maimonides refused the medical exemption on the basis that Bells Palsy is not contraindicated for Covid-19. However, Lancet Eric Wan and Infectious Disease study found an overall increased risk of Bells Palsy after taking the Corona vaccine. Ms. Ravenell has a history of two bouts of Bells Palsy which were frightening. At the time the COVID-19 vaccine mandate was implemented at Maimonides, Ms. Ravenell was a patient-facing Radiation Therapist. A Radiation Therapist at Maimonides works closely with patients and other staff at the Maimonides Cancer Center to administer radiation treatment to cancer patients. As such, the position paper is stating that Ms. Ravenell would be working with the most vulnerable patient populations at Maimonides due to their immunosuppressed status." The position paper states that that if there was ever a population that needed to ensure safety of patients, through employee vaccinations, the mandates protect its vulnerable cancer patients by requiring all staff to be vaccinated. However, one of the key points in the charge against Maimonides was that both the vaccinated and unvaccinated can contract and transmit COVID-19. Ms. Ravenell always wore an N-95 mask and offered to do this as accommodation to keep her job. She also offered to add weekly testing to the mask to ensure that she was COVID free.

On November 23, 2021, Maimonides fired Ms. Ravenell. Behind the scenes there was considerable misgivings and angst among staff. The days leading up to the mandate deadline were full of anxiety and despair for many. However, staff were looking at the heavy price that Ms. Ravenell paid for sticking to her religious beliefs.

After Ms. Ravenell's, firing several staff called to inform Ms. Ravenell that there was a COVID-19 outbreak within the staff at the Cancer Center which caused staffing coverage issues. Subsequently, a staff member who worked in the same department, with the same duties as Ms. Ravenell called to ask if Maimonides had called Ms. Ravenell back to work. He relayed that he was about to retire and was asked to come back to work on a per diem basis. He added that he contracted COVID and notified Maimonides and was told to return to work in 5 days. However, when he communicated to Maimonides staff that he did not feel comfortable and wanted to take the full 10 days and then be tested for Covid-19 before returning, he stated that Maimonides staff told him he did not need to be tested, just return after 5 days. Ms. Ravenell, perceived that all staff that called were surprised that Ms. Ravenell, had been fired for being unvaccinated while vaccinated staff were allowed to contract, possibly transmit, and recover from COVID and return to their jobs. In addition, staff now realized that the vaccinated vs. unvaccinated transmission narrative was untrue as the fully vaccinated staff had suffered outbreaks of COVID-19 although many had taken the vaccine against their will.

Actions speak much louder than words. The actions of Maimonides indicate:

1. Maimonides was unethical in their application of the Covid Vaccine mandates. The Maimonides position statement states *"one of the most vulnerable patient populations at Maimonides due to their immunosuppressed status."* Are the patients being treated in the Cancer Center. The position paper repeatedly emphasizes that that *"if there was ever a population that needed to ensure safety of patients, through employee vaccinations, the Maimonides Cancer Center is just such a location."* If this is the case then, the Cancer Center's actions in encouraging staff to return to work who had tested positive for COVID, and still felt sick was unethical and indicates that the safety of the patients was not their top ranked objective.

*The environment at Maimonides quickly demonstrated that the vaccinated could transmit the COVID 19 virus. Ms. Ravenell consistently informed Maimonides of the fact that both the vaccinated and unvaccinated could transmit COVID. This is a commonly known fact now that soon manifested itself visibly at Maimonides. However, Maimonides made no efforts to find an accommodation for Ms. Ravenell. It was well known by top officials that the vaccines would not stop transmission of the COVID virus. Deborah Birx, the former coordinator of the White House Coronavirus Task Force said "people are interpreting that the fact that they are vaccinated, or vaccinated and boosted, that they cannot be infected, that they're somehow invincible and they're*

carrying that virus into hospital. Birx has admitted that she knew COVID-19 vaccines would not prevent infection.[2] *Dr. Birx further stated,* Lets be very clear: 50 percent of the people who died from the Omicron surge were older and vaccinated[3]

2. *At the time of her firing, Ms. Ravenell who had not contracted COVID; and could not have transmitted Covid. Ms. Ravenell is a single parent, with two children in college/trade school and a mortgage. Ms. Ravenell's firing devastated her and her family, both financially and emotionally. It would make sense that re-hiring, comparable staff who was married and comfortably retired and who could have hypothetically spread Covid, while Maimonides policies had devastated Ms. Ravenell, who had served faithfully at Maimonides before and during the pandemic seemed odd to other employees. While Ms. Ravenell filed a medical exemption utilizing her history of Bells Palsey. Maimonides states it, did not grant Ms. Ravenell the Medical exemption due to two reasons:*

1. *Maimonides was constrained by DOH's Section 16 Order which limited granting to two contraindications:*

    i) a severe allergic reaction after a previous dose of the COVID-19 vaccine or

    ii) an immediate allergic reaction of any severity to a previous or known (diagnosed) allergy to a component of the vaccine.

2. *Maimonides said that since Ms. Ravenell was a patient facing staff, they could not accommodate her due to the nature of her position. However, the fact that Maimonides willingly brought a staff member back to work who was concerned that he may not have fully recovered from COVID speaks against not being able to accommodate an individual who never had COVID, or Maimonides need to ensure the safety of it's vulnerable cancer patients.*

Maimonides, following the standard developed by DOH literally denied the granting of medical exemption, while there are people with significant issues that would be contraindications to taking new vaccines into their body. In fact, both the Moderna and Pfizer trials, individuals who took the COVID vaccine contracted Bells Palsey. The issue with Bells Palsey that it can cause significant mental and emotional health issues related to it visible impact on the person's twisted and stroke like facial appearance. It is nightmarish and traumatic to those who have had the condition, because it can reoccur and it in some can last for a lifetime

---

[2]
[3]

Reports released from Pfizer and Moderna show that seven COVID-19 vaccine trial participants experienced a type of facial paralysis, called Bell's palsy, in the weeks after vaccination. This rare side effect, in tandem with three reports of <u>severe allergic reactions</u>, has raised some alarm about the safety of the new vaccines.

Ms. Ravenell contracted, Bells Palsey twice before being directed to take the COVID vaccine. People who have had Bells Palsey suffer with much more than just the issues that can be seen with the drooping and asymmetrical facial features. This condition can cause significant, emotional and psychological issues including:

- Shock
- Low self-esteem/low mood
- Anxiety about the future
- Loss of confidence in social situations
- Anxious about returning or continuing symptoms
- Anxiety about how to explain your Bell's palsy with others
- Feeling vulnerable/self-consciousness
- Ongoing hypervigilance/fear about the return of the condition

Ms. Ravenell was very uncomfortable about taking anything into her body that had been identified with adverse COVID reactions. Both Moderna and Pfizer trials found the COVID vaccines with triggering Bells Palsey. However, the writer of the Maimonides position paper, and thereby Maimonides belittled Ms. Ravenell's request by stating that "Ms. Ravenell submitted a nearly year-old physician note stating that she had been diagnosed with Bells Palsey." Ms. Ravenell submitted the note without noticing that the doctor had written the wrong date. Ms. Ravenell submitted the note to show the considerable amount of anxiety and mental stress she was under knowing that she had two bouts of Bells Palsy in the past. Being forced to take a vaccine that had triggered the condition in others was a cause of deep concern. Ms. Ravenell also submitted discharge papers from a Maimonides Emergency physician Dr. Mert Erogul who diagnosed her with Bells Palsy to legitimize her request. Ms. Ravenell will ask the doctor to rewrite the note. However, there would be no reason to write a note on 8/24/20 regarding Bells Palsey as an adverse reaction to the COVID vaccines for an exemption there was no mandate until 08/2021.

Ms. Ravenell's Religious exemption is denied—On November 16, 2021.

Ms. Ravenell's Religious exemption request was supported by clergy. Ms. Ravenell did not receive a vaccine by September 27, 2021 the deadline imposed by DOH, and she was placed on punitive unpaid leave to allow a pending court action about the COVID mandates in New York State. In addition, to severely limiting the scope of the medical exemptions DOH removed any reference to the religious exemptions as a means not to comply with the COVID vaccine

mandate. In addition, Maimonides refused to make any accommodation for Ms. Ravenell who had served faithfully during the pandemic. From the beginning of the pandemic until she was fired Ms. Ravenell wore an N95 mask and consented to daily temperature checks and never contracted COVID. She prayed consistently each day and gave the patients she served and Maimonides her best.

The Maimonides position paper goes on to list States and institutions that have banned religious exemptions. However public sentiment has begun to turn against the Vaccine mandates with major wins against institutions that have violated Title VII of the United 1964 Civil Rights Act.

14. Due to facial paralysis, contorted facial feature and uncertainty of whether the symptoms would resolve.

15. Ms. Ravenell is a devout Christian. It is against her religious beliefs to take aborted fetal cell lines into her body.

16. At the time the COVID-19 vaccine mandate was implemented at Maimonides, Ms. Ravenell was a patient-facing Radiation Therapist. A Radiation Therapist at Maimonides works closely with patients and other staff at the Maimonides Cancer Center to administer radiation treatment to cancer patients. As such, the position paper is stating that Ms. Ravenell would be working with the most vulnerable patient populations at Maimonides due to their immunosuppressed status." The position paper states that if there was ever a population that needed to ensure safety of patients, through employee vaccinations, the mandates protect its vulnerable cancer patients by requiring all staff to be vaccinated. However, one of the key points in the charge against Maimonides was that both the vaccinated and unvaccinated can contract and transmit COVID-19. Ms. Ravenell always wore an N-95 mask and offered to do this as accommodation to keep her job. She also offered to add weekly testing to the mask to ensure that she was COVID free.

*Kolcan Ravenell*
*April 14, 2023*

Defendant No.
Name: Maimonides Medical Center
Job or Title (if known): Paul Stuart Vice President
Street Address: Human Resources
City and County: 923 48th Street Brooklyn, NY
State and Zip Code: 11219
Telephone Number: (718) 283-6486
E-mail Address (if known): ~~www.maimonidesme~~
pstuart@maimonidesmed.org

Defendant No.
Name:
Job or Title (if known):
Street Address:
City and County:
State and Zip Code:
Telephone Number:
E-mail Address (if known):

Defendant No.
Name:
Job or Title (if known):
Street Address:
City and County:
State and Zip Code:
Telephone Number:
E-mail Address (if known):

Defendant No.
Name:
Job or Title (if known):
Street Address:
City and County:
State and Zip Code:
Telephone Number:
E-mail Address (if known):

Place of Employment
6300 8 Ave
Brooklyn, NY 11220
Dept of Radiation Oncology

13



## U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

Louisville Area Office
600 Dr. Martin Luther King, Jr Place, Suite 268
Louisville, KY 40202
(502) 694-3940
Website: www.eeoc.gov

# **DETERMINATION AND NOTICE OF RIGHTS**
(This Notice replaces EEOC FORMS 161 & 161-A)

Issued On: 01/20/2023

**To:** Ms. Rolean Ravenell
579 Schroeders Ave
BROOKLYN, NY 11239

Charge No: 520-2022-00845

EEOC Representative and email:   ALAN ANDERSON
Director
alan.anderson@eeoc.gov

## DETERMINATION OF CHARGE

The EEOC issues the following determination: The EEOC will not proceed further with its investigation and makes no determination about whether further investigation would establish violations of the statute. This does not mean the claims have no merit. This determination does not certify that the respondent is in compliance with the statutes. The EEOC makes no finding as to the merits of any other issues that might be construed as having been raised by this charge.

## NOTICE OF YOUR RIGHT TO SUE

This is official notice from the EEOC of the dismissal of your charge and of your right to sue. If you choose to file a lawsuit against the respondent(s) on this charge under federal law in federal or state court, **your lawsuit must be filed WITHIN 90 DAYS of your receipt of this notice.** Receipt generally occurs on the date that you (or your representative) view this document. You should keep a record of the date you received this notice. Your right to sue based on this charge will be lost if you do not file a lawsuit in court within 90 days. (The time limit for filing a lawsuit based on a claim under state law may be different.)

If you file a lawsuit based on this charge, please sign-in to the EEOC Public Portal and upload the court complaint to charge 520-2022-00845.

On behalf of the Commission,

Digitally Signed By:Michelle Eisele
01/20/2023
Michelle Eisele
District Director

**Cc:**
Steven Nevolis
Kelley Drye & Warren LLP
3 WORLD TRADE CTR 175 GREENWICH STREET
New York, NY 10007

Scott Goodman
sgoodman@maimonidesmed.org


Please retain this notice for your records.

Enclosure with EEOC Notice of Closure and Rights (01/22)

## INFORMATION RELATED TO FILING SUIT
## UNDER THE LAWS ENFORCED BY THE EEOC

*(This information relates to filing suit in Federal or State court **under Federal law**. If you also plan to sue claiming violations of State law, please be aware that time limits may be shorter and other provisions of State law may be different than those described below.)*

**IMPORTANT TIME LIMITS – 90 DAYS TO FILE A LAWSUIT**

If you choose to file a lawsuit against the respondent(s) named in the charge of discrimination, you must file a complaint in court **within 90 days of the date you *receive* this Notice**. Receipt generally means the date when you (or your representative) opened this email or mail. You should **keep a record of the date you received this notice**. Once this 90-day period has passed, your right to sue based on the charge referred to in this Notice will be lost. If you intend to consult an attorney, you should do so promptly. Give your attorney a copy of this Notice, and the record of your receiving it (email or envelope).

If your lawsuit includes a claim under the Equal Pay Act (EPA), you must file your complaint in court within 2 years (3 years for willful violations) of the date you did not receive equal pay. This time limit for filing an EPA lawsuit is separate from the 90-day filing period under Title VII, the ADA, GINA or the ADEA referred to above. Therefore, if you also plan to sue under Title VII, the ADA, GINA or the ADEA, in addition to suing on the EPA claim, your lawsuit must be filed within 90 days of this Notice **and** within the 2- or 3-year EPA period.

Your lawsuit may be filed in U.S. District Court or a State court of competent jurisdiction. Whether you file in Federal or State court is a matter for you to decide after talking to your attorney. You must file a "complaint" that contains a short statement of the facts of your case which shows that you are entitled to relief. Filing this Notice is not enough. For more information about filing a lawsuit, go to https://www.eeoc.gov/employees/lawsuit.cfm.

**ATTORNEY REPRESENTATION**

For information about locating an attorney to represent you, go to:
https://www.eeoc.gov/employees/lawsuit.cfm.

In very limited circumstances, a U.S. District Court may appoint an attorney to represent individuals who demonstrate that they are financially unable to afford an attorney.

**HOW TO REQUEST YOUR CHARGE FILE AND 90-DAY TIME LIMIT FOR REQUESTS**

There are two ways to request a charge file: 1) a FOIA Request or 2) a Section 83 request. You may request your charge file under either or both procedures. EEOC can generally respond to Section 83 requests more promptly than FOIA requests.

Since a lawsuit must be filed within 90 days of this notice, please submit your request for the charge file promptly to allow sufficient time for EEOC to respond and for your review. Submit a signed written request stating it is a "FOIA Request" or a "Section 83 Request" for Charge Number 520-2022-00845 to the District Director at Michelle Eisele, 1010 West Ohio St Suite 1900

Indianapolis, IN 46204.

You can also make a FOIA request online at https://eeoc.arkcase.com/foia/portal/login.

16

Enclosure with EEOC Notice of Closure and Rights (01/22)

You may request the charge file up to 90 days after receiving this Notice of Right to Sue. After the 90 days have passed, you may request the charge file only if you have filed a lawsuit in court and provide a copy of the court complaint to EEOC.

For more information on submitting FOIA Requests and Section 83 Requests, go to: https://www.eeoc.gov/eeoc/foia/index.cfm.

### NOTICE OF RIGHTS UNDER THE ADA AMENDMENTS ACT OF 2008 (ADAAA)

The ADA was amended, effective January 1, 2009, to broaden the definitions of disability to make it easier for individuals to be covered under the ADA/ADAAA. A disability is still defined as (1) a physical or mental impairment that substantially limits one or more major life activities (actual disability); (2) a record of a substantially limiting impairment; or (3) being regarded as having a disability. *However, these terms are redefined, and it is easier to be covered under the new law.*

If you plan to retain an attorney to assist you with your ADA claim, we recommend that you share this information with your attorney and suggest that he or she consult the amended regulations and appendix, and other ADA related publications, available at: http://www.eeoc.gov/laws/types/disability_regulations.cfm.

**"Actual" disability or a "record of" a disability**

If you are pursuing a failure to accommodate claim you must meet the standards for either "actual" or "record of" a disability:

- ✓ **The limitations from the impairment no longer must be severe or significant** for the impairment to be considered substantially limiting.
- ✓ In addition to activities such as performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, thinking, concentrating, reading, bending, and communicating (more examples at 29 C.F.R. § 1630.2(i)), **"major life activities" now include the operation of major bodily functions**, such as: functions of the immune system, special sense organs and skin; normal cell growth; and digestive, genitourinary, bowel, bladder, neurological, brain, respiratory, circulatory, cardiovascular, endocrine, hemic, lymphatic, musculoskeletal, and reproductive functions; or the operation of an individual organ within a body system.
- ✓ **Only one** major life activity need be substantially limited.
- ✓ Except for ordinary eyeglasses or contact lenses, the beneficial effects of **"mitigating measures"** (e.g., hearing aid, prosthesis, medication, therapy, behavioral modifications) **are not considered** in determining if the impairment substantially limits a major life activity.
- ✓ An impairment that is **"episodic"** (e.g., epilepsy, depression, multiple sclerosis) or **"in remission"** (e.g., cancer) is a disability if it **would be substantially limiting when active.**
- ✓ An impairment **may be substantially limiting even though** it lasts or is expected to last **fewer than six months.**

17

Enclosure with EEOC Notice of Closure and Rights (01/22)

## "Regarded as" coverage

An individual can meet the definition of disability if an **employment action was taken because of an actual or perceived impairment** (e.g., refusal to hire, demotion, placement on involuntary leave, termination, exclusion for failure to meet a qualification standard, harassment, or denial of any other term, condition, or privilege of employment).

- ✓ "Regarded as" coverage under the ADAAA no longer requires that an impairment be substantially limiting, or that the employer perceives the impairment to be substantially limiting.
- ✓ The employer has a defense against a "regarded as" claim only when the impairment at issue is objectively **both** transitory (lasting or expected to last six months or less) **and** minor.
- ✓ A person is not able to bring a failure to accommodate claim **if** the individual is covered only under the "regarded as" definition of "disability".

***Note:*** *Although the amended ADA states that the definition of disability "shall be construed broadly" and "should not demand extensive analysis," some courts require specificity in the complaint explaining how an impairment substantially limits a major life activity or what facts indicate the challenged employment action was because of the impairment. Beyond the initial pleading stage, some courts will require specific evidence to establish disability. For moreinformation, consult the amended regulations and appendix, as well as explanatory publications, available at* http://www.eeoc.gov/laws/types/disability_regulations.cfm.

18